Filed 6/20/25  Conservatorship of D.H. CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| Conservatorship of the Person and Estate of D.H. | B339914 <br><br> (Los Angeles County Super. Ct. No. 24NWMH00019) |
| PUBLIC GUARDIAN OF LOS ANGELES, as Conservator, etc., <br><br> Petitioner and Respondent, <br><br> v. <br><br> D.H., <br><br> Objector and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Rene C. Gilbertson, Judge.  Affirmed.

Gerald J. Miller, under appointment by the Court of Appeal, for Objector and Appellant.

Dawyn R. Harrison, County Counsel, Laura Quiñonez, Assistant County Counsel, Jose Silva and William C. Sias, Principal Deputy County Counsel, for Petitioner and Respondent.

_____

## INTRODUCTION

D.H. appeals from a judgment establishing a one-year conservatorship over him and his estate under the Lanterman-Petris-Short Act (Welf. & Inst. Code, § 5000 et seq.) (LPS Act or Act).[1]  He does not challenge the jury's finding he is "gravely disabled" by a mental health disorder, within the meaning of section 5350.  He argues only the trial court erred in imposing a conservatorship over him because he is (or, at least, was) a resident of Texas, not California.

D.H.'s argument confuses the distinct but related concepts of venue, subject matter jurisdiction, and personal jurisdiction.  In the end, however, D.H.'s proposed construction of the LPS Act is inconsistent with the statutory language.  In addition, D.H.'s proposed residency limitation on the implementation of the LPS Act, if adopted, would undermine one of the Act's major purposes: to provide humane care for people who are experiencing a severe mental health crisis and who are, as a result, unable to take care of themselves.  Therefore, we affirm.

_____

[1]     Undesignated section references are to the Welfare and Institutions Code.

2

# FACTUAL AND PROCEDURAL BACKGROUND

A. *The Public Guardian Petitions for a Conservatorship Under the LPS Act, Alleging D.H. Is Gravely Disabled by a Mental Disorder*

A team from the Los Angeles County Department of Mental Health first made contact with D.H. in May 2022, when he was living on the street in Long Beach. At that time he was dirty and not wearing shoes. He said that he was new to the area and that he planned to "get back on the bus" at the station. D.H. had food and "appear[ed] to be resilient and able to obtain his basic needs despite homelessness." D.H. declined mental health and homeless services.

The team came across D.H. again in September 2023. He was still homeless and "appeared ungroomed, malodorous, dirty, wearing dirty clothes with no shoes on, and was exhibiting mental health symptoms, including delusional thought content and disorganized thought process." At the time (nearly 16 months after his last contact with the team) D.H. said he had been living in California for six months.

In December 2023 D.H. was placed on an involuntary psychiatric hold under section 5150 at a hospital in Panorama City after he refused housing, clothing, shoes, and urgent medical attention. His pants were covered with feces, but he refused new clothing due to his delusions and paranoia. He had also wrapped hair around his fingers, which was restricting circulation to the point of possible auto-amputation if untreated. Dr. Conrado Sevilla, who was in charge of the hospital, evaluated D.H., determined he was gravely disabled as a result of a mental disorder (schizophrenia), referred the matter to the Office of the

Public Guardian for the County of Los Angeles, and recommended conservatorship.

In January 2024 the Public Guardian filed a petition for the appointment of a conservator of the person and estate of D.H. under the LPS Act (§ 5350) in the Superior Court for the County of Los Angeles. The Public Guardian conducted a conservatorship investigation and recommended conservatorship for D.H.

B. *D.H. Argues the Court Lacks Jurisdiction over Him Because He Is a Resident of Texas*

In May 2024 counsel for D.H. filed a motion styled a "challenge to the jurisdiction of the county of Los Angeles as [D.H.] is not an LA County resident." D.H. challenged "the authority of the County of Los Angeles to proceed with Conservatorship proceedings in this county and state as [D.H.] is a lifelong resident of Texas and intends to return to Texas." D.H. argued "[m]ere presence in the County is insufficient" to establish jurisdiction in Los Angeles County.

Counsel for D.H. submitted a supplemental brief titled "brief review of law applicable to determination of venue and jurisdiction in [D.H.'s] LPS conservatorship proceedings." D.H. again argued that, "because [he] is not a resident of California, the court is without jurisdiction to establish a conservatorship over his person or estate." Citing section 5352, D.H. argued that "the appropriate venue for an LPS conservatorship is the county where a person resided prior to involuntary admission to a treatment facility" and that a "conservatorship petition can only be brought in the county of residence of the proposed conservatee." D.H. contended the court

4

should determine his place of residence under Government Code section 244, subdivision (f), which (according to D.H.) "requires a unity of act and intent for [D.H.] to change his residence from Texas to California." He argued that his last established residence was in Texas and that he never intended to remain in California.

C. *The Court Rules That California Has Jurisdiction and That Venue Is Proper in Los Angeles County*

For the hearing on jurisdiction and venue, the parties stipulated that at some point in the past D.H. had a Texas identification card and that his last recorded house or apartment was in Texas. Counsel for D.H. stated: "We are specifically objecting that the court does not—not the court—the State of California, does not have jurisdiction to place . . . [D.H.'s] person or estate under a conservatorship because [he] is not a resident of California. So our issue—the court said jurisdiction [and] venue. They are distinct—our issue is jurisdiction and specifically jurisdiction over the person and estate of [D.H]."

Two witnesses testified about D.H.'s presence in Los Angeles. The Public Guardian presented testimony by Dr. Danielle Chang, a psychiatrist who worked for the Los Angeles County Department of Mental Health, who interacted with D.H. while D.H. was homeless in late 2023. D.H. told Dr. Chang that he had been in California for six months and that he wanted to return to Texas.

D.H. testified that he grew up in California, that he moved to Texas with his family when he was a teenager, and that he lived in Texas for almost 48 years. D.H. said that he went to Tracy, California in 2022 and that he was evaluated by the Tracy

5

Rehabilitation Center, which gave him a bus ticket to Dallas, Texas. D.H. said that he got off the bus in Los Angeles for a two-day layover, but that he was unable to reboard the bus to continue his trip. D.H. said he wanted to return to Texas as soon as possible.

The court ruled section 5352.5 "gives the court the authority to establish jurisdiction." The court stated that the purpose of the LPS Act was to allow the state to provide immediate assistance to individuals in crisis and that the residency limitation proposed by D.H. would undermine the Act's purpose. Alternatively, the court ruled, the Public Guardian established D.H. resided in Los Angeles under Government Code section 244. Specifically, the court found D.H. had been in Los Angeles for most of 2023 and made no substantial effort to return to Texas. The court stated that, when asked if he had family or friends to assist him in Texas, D.H. said, "Yes and no." The court observed that, although D.H. provided names and phone numbers of contacts in Texas, the Public Guardian's attempts to contact those people indicated they "had moved on" and "may not necessarily be there for him." The court ruled that jurisdiction was proper in California and that venue was proper in Los Angeles County.

D. *A Jury Finds D.H. Is Gravely Disabled by a Mental Disorder, and D.H. Appeals*

After addressing jurisdiction and venue, the court conducted a short jury trial. The jury found D.H. was gravely disabled by a mental disorder, within the meaning of the LPS Act. The court granted the petition and appointed the Public Guardian conservator over the person and estate of D.H.,

6

with the conservatorship to terminate on July 15, 2025. D.H. timely appealed.

## DISCUSSION

A.   *Applicable Law and Standard of Review*

"The LPS Act governs the involuntary detention, evaluation, and treatment of persons who, as a result of mental disorder, are dangerous or gravely disabled.  [Citation.]  The Act authorizes the superior court to appoint a conservator of the person for one who is determined to be gravely disabled [citation], so that he or she may receive individualized treatment, supervision, and placement."  (*Conservatorship of John L.* (2010) 48 Cal.4th 131, 142; see *Conservatorship of A.J.* (2025) 109 Cal.App.5th 728; *Enmark v. KF Community Care, LLC* (2024) 105 Cal.App.5th 463, 470.)  A person is "gravely disabled" under the LPS Act if, "as a result of a mental health disorder, a severe substance use disorder, or a co-occurring mental health disorder and a severe substance use disorder, [the person] is unable to provide for their basic personal needs for food, clothing, shelter, personal safety, or necessary medical care."  (§ 5008, subd. (h)(1)(A).)

The LPS Act "describes a detailed, calibrated system for intervention when circumstances indicate a person may be suffering from a mental health disorder.  In addition to conservatorships, the Act permits 3-day, 14-day, and 30-day involuntary detentions for intensive treatment." (*Conservatorship of K.P.* (2021) 11 Cal.5th 695, 706.)  A "series of temporary detentions may culminate in a proceeding to determine whether the person is so disabled that he or she should

7

be involuntarily confined for up to one year.  [Citations.]  Because of the important liberty interests at stake, correspondingly powerful safeguards protect against erroneous findings." (*Conservatorship of Ben C.* (2007) 40 Cal.4th 529, 541; see *K.P.*, at pp. 707-708.)

Section 5352 describes the professional recommendation needed to initiate conservatorship proceedings.  The first paragraph of section 5352 addresses the process for individuals, like D.H., who have been temporarily detained for evaluation and treatment.  When the professional in charge of a facility providing intensive treatment "determines that a person in his or her care is gravely disabled as a result of mental disorder or impairment by chronic alcoholism and is unwilling to accept, or incapable of accepting, treatment voluntarily, he or she may recommend conservatorship to the officer providing conservatorship investigation of the county of residence of the person prior to his or her admission as a patient in such facility."[2] (§ 5352, 1st par.; see *Conservatorship of K.P., supra,* 11 Cal.5th at p. 708.)  The "professional's recommendation simply starts the conservatorship process.  If the county's investigative office agrees with the recommendation, it initiates court proceedings. [Citation.]  The county then conducts a comprehensive investigation of available alternatives to conservatorship, examining 'all relevant aspects of the person's medical, psychological, financial, family, vocational, and social condition,

---

[2]     Each county must designate an agency or agencies to provide the conservatorship investigation required under the LPS Act.  (§ 5351.)  In Los Angeles County the Office of the Public Guardian within the Department of Mental Health is responsible for conducting those investigations.

and information obtained from the person's family members, close friends, social worker, or principal therapist.' [Citation.] After this investigation, the county is empowered to 'recommend conservatorship to the court only if no suitable alternatives are available.' [Citation.] A conservator may then be appointed if the person is found to be gravely disabled as a result of a mental health disorder." (*K.P.*, at p. 709.) A Lanterman-Petris-Short conservatorship terminates after one year, and the conservator may seek reappointment by filing a petition. (§ 5361.)

"Where—as here—evidence "'of jurisdictional facts is not in dispute, the issue whether the defendant is subject to personal jurisdiction is a legal question subject to de novo review.'"" (*Yue v. Yang* (2021) 62 Cal.App.5th 539, 546.) To the extent we interpret the provisions of the LPS Act, "[o]ur goal in construing the LPS Act is to effectuate the Legislature's intent. [Citation.] We consider individual statutes in the context of the entire Act so that each part may be harmonized and given effect." (*Conservatorship of K.P.*, *supra*, 11 Cal.5th at p. 706.)

B.     *The Superior Court Did Not Err in Ruling That It Had Jurisdiction (and That Venue Was Proper in Los Angeles County)*

D.H. argues the superior court lacked jurisdiction to impose a conservatorship under the LPS Act because he is a resident of Texas. D.H. is incorrect.

"The term 'jurisdiction' has different meanings, depending on the context in which it is used. Its fungible nature and its relationship with the related doctrine of venue can often cause confusion. [¶] In its truest sense, jurisdiction refers to a court's authority to try the case before it. This is a court's jurisdiction in

9

a fundamental sense, the competency or inherent authority to hear a case and render a valid judgment. [Citation.] 'Fundamental jurisdiction is, at its core, authority over both the subject matter and the parties.' [Citation.] . . . Fundamental jurisdiction is statewide and not specific to any one county. 'The process of superior courts shall extend throughout the state.'" (*Capra v. Capra* (2020) 58 Cal.App.5th 1072, 1082.) "In contrast to jurisdiction, venue concerns which county superior court having fundamental jurisdiction is the proper court geographically to try the action. Statutes designate which county superior court is 'the' or 'a' proper court for trying the action. [Citation.] [¶] Jurisdiction and venue can become intertwined, but in most actions, venue rules are not jurisdictional." (*Id*. at p. 1083.)

To support his argument the superior court lacked jurisdiction to impose a conservatorship over him, D.H. focuses on the Legislature's use of the term "residence" in sections 5352 and 5352.5. As stated, section 5352 provides that a professional may initiate a conservatorship inquiry by making a recommendation to "the officer providing conservatorship investigation of the county of residence of the person prior to his or her admission as a patient in such facility" (§ 5352, 1st par.; see *K.R. v. Superior Court* (2022) 80 Cal.App.5th 133, 139) and that, if the investigating officer "concurs with the recommendation, he or she shall petition the superior court in the county of residence of the patient to establish conservatorship" (§ 5352, 3d par.). Section 5352.5 also provides that, where a person has been placed in a state hospital or mental health facility before a mental health professional has made a conservatorship recommendation, the recommendation should be

made to the conservatorship investigator for "the county of residence of the person prior to his or her admission to the hospital or facility or of the county in which the hospital or facility is located." (§ 5352.5, subd. (a).)

Although sections 5352 and 5352.5 refer to the proposed conservatee's "county of residence," they relate to venue, not jurisdiction. In both statutes the reference to "county of residence" is geographic, i.e., it designates which county's public official will undertake the conservatorship investigation and which county's superior court will hear the public official's petition. D.H. does not provide any analysis of the two venue statutes or explain why they have any bearing on the court's jurisdiction. (See *Siskiyou Hospital, Inc. v. County of Siskiyou* (2025) 109 Cal.App.5th 14, 39 ["The absence of reasoned legal argument supported by citation to authority allows this court to treat the contention as forfeited."]; *Conservatorship of Kevin A.* (2015) 240 Cal.App.4th 1241, 1253 [failure to include supporting citations to the record forfeits an argument on appeal].)[3]

And even the (irrelevant) Probate Code provisions governing venue contemplate nonresidents of California may be subject to conservatorship proceedings in California, even if the

---

[3] Although D.H. relies on statutes relating to venue, he does not challenge the court's ruling Los Angeles County is the proper venue. Which, though perhaps inadvertent, was wise: The professional who recommended conservatorship for D.H. worked at a mental health facility in Panorama City (which is in the County of Los Angeles), where D.H. was involuntarily placed under section 5150. The trial court did not err in finding venue for the Public Guardian's petition was proper in Los Angeles County.

11

nonresidents are here only temporarily.  The LPS Act provides that, with certain exceptions, the "procedure for establishing, administering, and terminating a conservatorship under [the Act is] the same as that provided in Division 4 (commencing with Section 1400) of the Probate Code."  (§ 5350.)  Probate Code section 2202, subdivision (a), addresses the proper venue for conservatorship proceedings over nonresidents of California:  "The proper county for the commencement of a proceeding for the guardianship or conservatorship of the person of a *nonresident of this state* is either of the following:  [¶]  (1) The county in which the proposed ward or conservatee is temporarily living.  [¶]  (2) Such other county as may be in the best interests of the proposed ward or proposed conservatee."  (Italics added; see 15 Witkin, Summary of Cal. Law (11th ed. 2024) Wills, § 1061.)[4]

D.H., (still) assuming out-of-state residence deprives the court of jurisdiction to impose a Lanterman-Petris-Short

---

[4]     Citing Probate Code section 1981 D.H. argues Probate Code section 2202, subdivision (a), does not apply.  He is wrong for two reasons.  First, as D.H. recognizes, Probate Code section 1981, subdivision (b)(5), states "this chapter" does not apply to proceedings under the LPS Act.  Probate Code section 2202, however, is not part of "this chapter," i.e., the California Conservatorship Jurisdiction Act (Probate Code sections 1980 through 2033).  Which means the nonapplicability provision D.H. relies on in Probate Code section 1981, subdivision (b)(5), does not apply to the issue of venue in this action (and Probate Code section 2022 does).  Second, Probate Code section 2202, like sections 5352 and 5352.5, relates to venue, not jurisdiction.  (See *Guardianship of Ariana K.* (2004) 120 Cal.App.4th 690, 704 [Probate Code section 2201, relating to residents, "is a venue statute—not a jurisdictional provision"].)

12

conservatorship over him, argues the court should determine his "residence" using the definitions in Government Code section 244. (Neither the LPS Act nor the Probate Code define "residence.") But as discussed, the references to "residence" in the LPS Act relate to venue, not jurisdiction. To the extent D.H. is arguing the proper jurisdiction for any conservatorship proceeding is Texas rather than California, Probate Code section 2200, subdivision (b), states that the California Conservatorship Jurisdiction Act ("Chapter 8 (commencing with Section 1980) of Part 3") governs which state or states have jurisdiction over a conservatorship proceeding.[5] But, as discussed, that act does not apply to proceedings under the LPS Act. (Prob. Code, § 1981, subd. (b)(5).) Notably, D.H. does not argue this exclusion creates a jurisdictional gap or loophole that prevented the court from exercising jurisdiction over him. Nor does D.H. argue the Public Guardian failed to comply with the notice and service provisions of the LPS Act that provide a basis for the court's personal jurisdiction. (See *Conservatorship of Isaac O.* (1987) 190 Cal.App.3d 50, 54 [proper service of citation and petition was sufficient for court to assert personal jurisdiction over potential conservatee].)

Finally, to the extent D.H. contends (as he did in the trial court) California could not apply the LPS Act to him while he was physically present in California because he said he wanted to return to Texas, such a contention lacks merit. A state has "a legitimate interest under its *parens patriae* powers in providing

---

[5] The Legislature adopted the California Conservatorship Jurisdiction Act effective in 2018, a modified version of the Uniform Adult Guardianship and Protective Proceedings Jurisdiction Act.

13

care to its citizens who are unable because of emotional disorders to care for themselves; the state also has authority under its police power to protect the community from the dangerous tendencies of some who are mentally ill." (*Addington v. Texas* (1979) 441 U.S. 418, 426; see *Kansas v. Hendricks* (1997) 521 U.S. 346, 356-357 [states may forcibly detain people with mental illness "who are unable to control their behavior and who thereby pose a danger to the public health and safety"]; *People v. McKee* (2010) 47 Cal.4th 1172, 1188 [same].) Adding a residency requirement to the LPS Act would compromise the state's ability to protect the community from the conduct of individuals gravely disabled by a mental health condition and to provide compassionate care to individuals who find themselves within the state's boundaries at a period of extreme crisis.

Adding such a residency requirement would also be inconsistent with the Legislature's goals in enacting the LPS Act. "There is no question that the public interests promoted by the LPS Act are substantial. The goals of the Act include "'ending the inappropriate and indefinite commitment of the mentally ill, providing prompt evaluation and treatment of persons with serious mental disorders, guaranteeing and protecting public safety, safeguarding the rights of the involuntarily committed through judicial review, and providing individualized treatment, supervision and placement services for the gravely disabled by means of a conservatorship program. [Citation.]" [Citation.] The Act also serves to protect the mentally ill from criminal victimization [citation] and from the myriad forms of suffering endured by those unable to care for themselves.'" (*Conservatorship of John L.*, *supra*, 48 Cal.4th at p. 150.) Discriminating among gravely disabled people based on their

14

residence would leave people like D.H.—who because of a grave disability cannot return to the state he says he wants to go to—without assistance when they desperately need it.

## DISPOSITION

The judgment is affirmed.

SEGAL, J.

We concur:

MARTINEZ, P. J.

FEUER, J.

15